**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\*\*\*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>DEARRL DIGGS,<br><br>        Defendant. | Case No. 2:16–cr–227–GMN–VCF<br><br>**REPORT & RECOMMENDATION** |

       Before the court Diggs's motion to suppress (ECF No. 17), the Government's response (ECF No. 21), and Diggs's reply (ECF No. 25). This court held an evidentiary hearing on November 9, 2016 at 1:00 p.m. For the reasons stated below, Diggs's motion should be granted.

**I. Background**

       On July 12, 2016, Las Vegas Metropolitan police ("Metro") officers Spurling and Donegan noticed a dark blue sedan fail to make a complete stop at a stop sign. (ECF No. 17-1) The officers conducted a traffic stop. (*Id.*) Officer Spurling approached the driver, Joshua Kline. (ECF No. 18)[1] At the same time, Officer Donegan approached the front-seat passenger, Defendant Dearrl Diggs. (*Id.*)

       Officer Spurling asked Kline if he is "high"; Kline gave an inaudible response. (*Id.*) Officer Donegan can be overheard asking Diggs for identification. (*Id.*) At this point, Officer Spurling asked Kline if there are any guns or drugs in the car. (*Id.*) Kline appeared to have answered, "no." Officer

---

[1] Docket entry 18, also marked as Defense Exhibit B, is a CD containing six video clips of the traffic stop. The clips are taken from Officer Spurling's body camera. The camera clearly captured Officer Spurling's statements, but was at times unable to record Kline's and Diggs's responses. At other times, the camera captured portions of Officer Donegan's conversation with Diggs. Only the 5 clips recorded at the scene of the stop were received into evidence.

Spurling then asked Kline about a green medicine bottle located in the center consol. (*Id.*) Without giving an audible response, Kline handed Officer Spurling the bottle. (*Id.*)

Meanwhile, Officer Donegan continued to ask Diggs for identification. (*Id.*) At one point, she asked, "why are you playing with me?" and "why you playing me like that?" (*Id.*) She also commented that Diggs was "acting real weird." (*Id.*) According to Officer Donegan's police report, Diggs gave her a false name, Samuel Jones, and appeared very nervous. (ECF No. 17-1) Suspecting Diggs was not being truthful, Officer Donegan informed him that it was a crime to give false information to a police officer. (*Id.*) Diggs identified himself as Dearrl Diggs. (ECF No. 18)

After asking Kline about his criminal history, Officer Spurling told Kline to place his hands on the steering wheel and moved to the front passenger-side window to assist Officer Donegan. (*Id.*)

As Officer Spurling approached the window, Diggs's stated, "I'm not lying to you." (*Id.*) Officer Donegan responded, "well you've already lied to me a whole bunch." (*Id.*) Officer Spurling asked Diggs if he has any warrant; he responded that he is on probation. (*Id.*) Officer Spurling then asked Diggs if there are any guns or weed in the car. (*Id.*) Diggs answered no to both questions. (*Id.*)

While he is being pulled out of the vehicle, Diggs made a number of statements regarding his personal life and his current situation. (*Id.*) It appeared that Diggs had resigned himself to going to jail that night. (*Id.*)("And if I go to jail tonight, I just go to jail.") Officer Spruling assured Diggs that he had no intention of taking Diggs to jail. (*Id.*) He then informed Diggs that the officers would search the vehicle based on marijuana residue found in the green bottle. (*Id.*) Before Diggs exited the vehicle, Officer Spurling again asked Diggs if he had any weapons. (*Id.*) Diggs nodded his head "yes" before answering "no." (*Id.*) Diggs also appeared to hesitate, before agreeing to be removed from the vehicle. (*Id.*)

At the evidentiary hearing, Officer Spurling testified that these suspicious responses alerted him to the possible presence of a gun in the vehicle.

Once outside of the vehicle, Officer Spurling ordered Diggs to place his hands on top of the vehicle. (*Id.*)  He then performed a pat-down search. (*Id.*)  No weapons or contraband were found. (*Id.*) Officer Spurling then escorted Diggs to the curb immediately behind the vehicle. (*Id.*)  Officer Spurling stated that he did not want Diggs to "feel like he needs to do anything stupid." (*Id.*)  Diggs was seated, told to cross his legs in front of him, and instructed to remain on the curb. (*Id.*)  Kline was then removed from the vehicle and seated next to Diggs. (*Id.*)

Both officers testified that, at this point, nether Diggs nor Kline was free to leave, and the officers would have stopped any escape attempt.

Officer Spurling asked Kline[2] if there were any guns or drugs in the vehicle. (*Id.*)  Diggs confessed that there was a weapon in the vehicle. (*Id.*)  The officer followed up, "what kind [of weapon was in the vehicle]?" (*Id.*)  Diggs described a 9 millimeter handgun. (*Id.*)  Officer Spurling then asked, "is it yours?"; Diggs denied ownership. (*Id.*)

Both individuals are immediately placed in handcuffs. (*Id.*)  Officer Spurling walked back to the vehicle and confirmed that there was a handgun under the front passenger seat. (*Id.*)  While he performed his check, Officer Spurling commented, "I knew there was one in there.  I'm glad you said something." (*Id.*)  Officer Spurling then walked back over to Kline and Diggs and read them their *Miranda* rights.

---

[2] Diggs contends that the questions were posed to both individuals. (ECF No. 17) The body camera footage does not reveal precisely to whom the questions were directed.  For purposes of this motion, this court will credit Officer Spurling's testimony that the questions were directed only to Kline.

Diggs confirmed that he understood his rights. (*Id.*) Officer Spurling then asked, "so you [Diggs] were in possession of that firearm?" (*Id.*) Diggs gave an inaudible response. The officer continued, "was it on you when we rolled up?" (*Id.*) Diggs said that it was not. (*Id.*) Diggs explained that he has had a "rough life," his uncle had recently been murdered, and that an unidentified individual had shot at him. (*Id.*) He implied he had the handgun for protection.

A records check revealed that the firearm was stolen. Diggs was arrested on possession of stolen property. (ECF No. 17-1) On July 26, 2016, a grand jury indicted Diggs on one count of being a felon in possession of a firearm. (ECF No. 1)

## II. Discussion

1. <u>Diggs Was In Custody When He Made His Pre-Warning Statement[3]</u>

After he was seated on the curb, but before he was placed in handcuffs, Diggs told Officer Spurling that there was a handgun in the vehicle. (ECF No. 18). Diggs contends that he was in custody at this time and should have been given a *Miranda* warning. (ECF No. 17) His *unMirandized* statement about the handgun should therefore be suppressed. (*Id.*) The Government argues that the situation did not amount to a custodial interrogation. (ECF No. 21)

"The touchstone for *Miranda* warnings is whether the suspect is in custody when interrogated." *United States v. Barnes*, 713 F.3d 1200, 1204 (9th Cir. 2013)(*Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). "An officer obligation to give a suspect *Miranda* warnings before

---

[3] Diggs asserts that Officer Spurling's pre-warning questioning constituted an interrogation. (ECF No. 17) "Certainly not ever question is an interrogation." *United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir. 1981). "[C]ustodial questioning constitutes interrogation whenever, under all circumstances involved in a given case, the questions are reasonably likely to elicit an incriminating response from the suspect." *Id.*(internal quotations omitted). The Government does not appear to dispute that Officer Spurling's questions constituted an interrogation. (ECF No. 21) In the interest of completeness, this court has considered the officer's questions in the context of the encounter and concludes that the questions do constitute an interrogation. Even if Officer Spurling's questions were directed at Kline, the officer knew or should have known that his questions were reasonably likely to elicit an incriminating response from Diggs given his proximity to Kline. *Booth*, 669 F.2d at 1237.

interrogation extends only to those instances where the individual is 'in custody.'" *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). "To determine whether an individual was in custody, [the court] must decide whether a reasonable person in the circumstances would have believed he could freely walk away from the interrogators." *Barnes*, 713 F.3d at 1204. When conducting a custody analysis, the court considers the following factors:

> (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual.

*Id.*

    a.    *Language Used*

The first factor considers whether an individual "voluntarily approached or accompanied law officers *understanding that questioning would ensue*." *Kim*, 292 F.3d at 973 (emphasis in original). In *Kim*, the defendant voluntarily arrived at her grocery store, only to discovery that it was surrounded by uniformed police officers. *Id.* Once she identified herself as the co-owner of the store, police officers ordered her to "shut up," isolated her from her family, and began questioning her. *Id.* On appeal, the majority was careful to differentiate between an individual who voluntarily speaks with police and an individual who voluntarily appears at a location, and is then confronted by unexpected police questioning. *Id.* at 974. The former individual would likely expect that he retained the ability to end the encounter at any time. *Id.* at 974-75. By contrast, the later individual would likely feel that he would not be able to end the encounter. *Id.* at 975. Such lack of choice weighs in favor of finding the defendant "in custody." *Id.* at 976.

Diggs's contact with Metro was far from voluntary. He was the passenger in a vehicle that had been stopped for a traffic violation. The officers approached the driver and passenger

side windows simultaneously and began to question Diggs and Kline.  This type of involuntary, confrontational questioning weighs in favor of finding Diggs in custody.  *See id.*

    b.  *Officer's Tone*

The Ninth Circuit has "found a defendant in custody when the interrogator adopts an aggressive, coercive, and deceptive tone."  *United States v. Bassignani*, 575 F.3d 879, 885 (9th Cir. 2009); *see also United States v. Beran-Panez*, 812 F.2d 578, 579 (9th Cir. 1987)(finding the defendant was in custody when police officers repeatedly accused the defendant of lying).

Although this court does not have a line-by-line transcription with her interaction with Diggs, it is clear from Office Spurling's body camera video that Officer Donegan adopted an aggressive tone.  (ECF No. 18)  She repeatedly accused him of lying and ultimately told Diggs that is was a crime to give false information to law enforcement.  (ECF No. 17-1)  Additionally, Officer Spurling adopted a firm, yet polite, tone with Diggs.  (*Id.*)  He told Diggs he was getting out of the car and the car was going to be searched.  (*Id.*)  Officer Spurling never gave Diggs the chance to object or told him that he could refuse.  (*Id.*)  The officers' tone coupled with Officer Donegan's accusation that Diggs had committed a crime was analogous to confronting Diggs with evidence of his guilt.  *See Beran-Panez*, 812 F.2d at 579.  The second factor weighs in favor of finding Diggs was in custody.

    c.  *Physical Surroundings*

"[A]n interrogation conducted in familiar surroundings weighs against a finding that the defendant was in custody."  *Bassignani*, 575 F.3d at 885.

Diggs was questioned in a vehicle and on the curb at night.  (ECF No. 18)  Although Diggs was on a public street, the video footage revealed that few cars passed the scene and pedestrians passed on foot.  (*Id.*)  It is unclear to what degree Diggs was familiar with his

surroundings, but the fact that the encounter took place on a public street weighs against custody. However the lack of passersby as well as the time of day detracts from the non-custodial nature of a public locale. *See Berkemer v. McCarty*, 468 U.S. 420, 438, 104 S.Ct. 3138, 1349, 82 L.Ed.2d 317 (1984). The third factor is thus neutral.

### d.  *Duration of Detention*

The short duration of interrogation weighs against finding Diggs in custody. *United States v. Brobst*, 558 F.3d 982, 996 (9th Cir. 2009). Approximately 6 minutes elapsed between the initial stop and Diggs and Kline being placed in handcuffs. Even if this entire period is considered an interrogation, its brevity still weighs against a finding of custody.

### e.  *Degree of Pressure Applied to Detain Diggs*

Generally, "a defendant is not in custody when officers tell him that he is not under arrest and is free to leave at any time." *Bassignani*, 575 F.3d at 886. "There mere recitation of the statement that the suspect is free to leave or terminate the interview, however, does not render an interrogation non-custodial *per se*." *United States v. Craighead*, 539 F.3d 1073, 1088 (9th Cir. 2008). The court "must consider the delivery of these statements within the context of the scene as a whole." *Id.* "The *Miranda* test for custody does not ask whether the suspect was told that he was free to leave; the test asks whether 'a reasonable person [would] have felt he or she was not at liberty the interrogation and leave.'" *Id.* (emphasis in original)(citing *Thompson v. Keohane*, 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)).

*Beraun-Perez* is instructive on this factor. In *Beraun-Perez*, police officer stopped the defendant on his ranch in rural Idaho. 812 F.2d at 581. During the encounter, the defendant stood next to the hood of his truck between the two police officers. *Id.* While the defendant was neither placed in handcuffs or told he was under arrest, he was also told he was not free to leave.

*Id.* The Ninth Circuit affirmed the district court's determination that the aforementioned facts constituted a degree of pressure that weighed in favor of a custodial interrogation. *See id.*

Although, Officer Spurling repeatedly told Diggs, "no one's trying to take you to jail" and that "[the presence of marijuana residue in the vehicle] doesn't mean you're going to jail." (ECF No. 18), these bare recitations are insufficient to render the interrogation non-custodial. *See Craighead*, 539 F.3d at 1088. They must be viewed in context.

While Officer Spurling was assuring Diggs he would not be taken to jail, the officer removed Diggs from the vehicle, sat him cross-legged on the curb, and was warned not to get up.[4] He also took Diggs's identification and kept it for the duration of the stop. A reasonable person, sitting in Diggs's position, would not have left free to leave. *See id.* Indeed, it would have been quite difficult for Diggs to leave. He would have needed to uncross his legs, pick himself off the ground, and avoid a police officer who likely anticipated an escape attempt. At the evidentiary hearing, both officers testified that they would have stopped Diggs if he had tried to leave the scene. Despite Officer Spurling's assurances, the fifth factor weighs in favor of a custodial interrogation.

Given the totality of the circumstances, a reasonable person in Diggs's position would not have felt free to terminate the encounter and leave. Diggs was therefore in custody when he made his pre-warning incriminating statement. The absence of a *Miranda* warning during Diggs's initial custodial interrogation warrants the suppression of Diggs's pre-warning statement. *Kim*, 292 F.3d at 978.

/// /// ///

---

[4] Officer Spurling's exact words were, "I don't want you to feel like you need to anything stupid." (ECF No. 18) This court interprets the words "anything stupid" to mean an escape attempt.

2.  Office Spurling Used a Deliberate, Two-Step Interrogation Technique

Diggs's also moves to suppress his post-warning statements as a product of a deliberate, two-step interrogation technique.  (ECF No. 17)

"[W]here law enforcement officers deliberately employ a two-step interrogation to obtain a confession and where separations of time and circumstance and additional curative warnings are absent or fail to apprise a *reasonable person* in the suspect's shoes of his rights, the trial court should suppress the confession." *United States v. Williams*, 435 F.3d 1148, 1158 (9th Cir. 2006)(citing *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004)(emphasis in original).

"A two-step interrogation involves eliciting an unwarned confession, administering the *Miranda* warnings and obtaining a waiver of *Miranda* rights, and then eliciting a repeated confession." *United States v. Narvaez-Gomez*, 489 F.3d 970, 973-74 (9th Cir. 2007).

   a.  *Deliberateness*

"[I]n determining whether the interrogator deliberately withheld the *Miranda* warning, court should consider whether objective evidence and any available subjective evidence, such as an officer's testimony, support an inference that the two-step procedure was used to undermine the *Miranda* warning." *Williams*, 435 F.3d at 1158.  "Such objective evidence would include the timing, setting and completeness of the pre-warning interrogation, the continuity of police personnel and the overlapping content of the pre- and post-warning statements." *Id.* at 1159.

"Once a law enforcement officer has detained a suspect *and subjects him to interrogation …* there is rarely, if ever, a legitimate reason to delay giving a *Miranda* warning until after the suspect has confessed." *Id.* (emphasis in original) "Instead, the most plausible reason for the delay is an *illegitimate* one, which is the interrogator's desire to weaken the warning's effectiveness." *Id.* (emphasis in original).

i. Circumstances of the Pre-Warning Interrogation

The first deliberateness factor is neutral. The pre-warning interrogation was brief. (ECF No. 18) It consisted of three questions over approximately 30 seconds. (*Id.*) Although it immediately preceded the post-warning interrogation, it was not the type of lengthy, exhaustive interrogation that is usually the subject of a *Seibert* challenge. *Seibert*, 542 U.S. at 605("[police officers] questioned her without *Miranda* warnings for 30 to 40 minutes"); *Barnes*, 713 F.3d at 1204 ("*Miranda* warnings were given after ten to twenty minutes.") Attributes of the pre-warning interrogation, such its close temporal proximity to the subsequent interrogation, favor deliberateness. *See Barnes*, 713 F.3d at 1204. Other attributes, such as its brevity, weigh against deliberateness. Taken together, these elements balance each other out and result in the first factor being neutral.

ii. Continuity of Interrogator

The second factor favors deliberateness. The presence of the same interrogator for the pre- and post-warning interrogations supports a finding that the two phrases of questioning were part of one continuous interrogation. *See Narvez-Gomez*, 489 F.3d at 974. The insertion of a *Miranda* warning mid-stream during an interrogation indicates that any delay in providing a defendant with a *Miranda* warning was deliberate. *See Barnes*, 713 F.3d at 1205-06. Officer Spurling conducted both the pre- and post-warning interrogations. This continuity of interrogator favors a finding of deliberateness.

iii. Overlapping Content of the Pre- and Post-Warning Interrogations

The third factor favors deliberateness. The overlapping content of a pre- and post-warning interrogations "shows the temptations for abuse inherent in the two-step technique." *Seibert*, 542 U.S. at 625 (Kennedy, J concurring). There was significant overlap between the pre- and post-warning interrogations. One of the pre-warning questions was whether there was a gun in the vehicle. (ECF No.

18) Once Diggs confirmed its location, the Officer Spurling asked if he owned it.  (*Id.*)  Diggs denied ownership.  (*Id.*)

The post-warning questioning picked up where the first interview left off.  The officer asked Diggs if he owned the gun and if he had been carrying it on his person prior to the traffic stop.  (*Id.*)  Diggs gave a qualified response to the first question, which appeared to imply that he owned it.  (*Id.*)

Both questions were designed to elicit an incriminating response  (*Id.*)  This interaction highlighted the dangers of the two-step technique.  The officer elicited an incriminating response without a *Miranda* warning, then attempted to safeguard it by eliciting the same response after delivering a *Miranda* warning.  (*Id.*)

Although brief, Officer Spurling's continuous interrogation is evidence that his decision to initially withhold the *Miranda* warning was deliberate.

### iv.     Officer Spurling's Observations and Comments

In *Williams*, the Ninth Circuit provided a non-exhaustive list of the objective evidence a court should consider when determining whether a two-step interrogation was deliberate. 435 F.3d at 1158. *Williams* suggest that a court may consider other case-specific, objective evidence that support an inference of deliberateness.  *See id.*  Such evidence exists here: (1) the context of the traffic stop; (2) Officer Spurling's inferences based on Diggs's behavior; (3) the phrasing of a questions; and (4) the officer's comment after Diggs admitted a gun was in the vehicle.

As an initial matter, this incident was far from a "ordinary" traffic stop.  Both officer testified that they were part of Metro's violent crime patrol.  During the night in question, they were on patrol in a high-crime neighborhood.  They were instructed to stop any vehicle that committed a traffic infraction, and ascertain the driver's reason for being in the neighborhood and determine if the vehicle contained any guns or other contraband.  It was against this backdrop that the officer's stopped Kline and Diggs.

Prior to removing Diggs from the vehicle, Officer Spurling asked him if there were any guns in the in car. (ECF No. 18) Diggs nodded his head "yes" before answering "no." (*Id.*) Diggs also hesitated before stepping out of the vehicle. Officer Spurling testified that Diggs's behavior indicated to him that there was possibly a gun in the vehicle. Once Kline and Diggs had been removed from the car, the stop took on a decidedly investigatory tone. The officers were no longer interested in citing Kline. Instead, they were searching the car to find drugs or firearms.

Once Diggs was seated on the curb, Officer Spurling asked Kline if there were any guns in the car. (ECF No. 18) Diggs responded that there was a weapon in the car. Officer Spurling asked two follow-up questions: (1) "what kind?" and (2) "is it yours?" The officer testified that these questions were purely focused on officer safety. This court disagrees as to the second question.

The question "is it yours?" has a decidedly investigatory tone. Officer Spurling could have accomplished his asserted officer-safety goal by asking less invasive questions such as: (1) where is the gun? or (2) is it loaded? Instead, Officer Spurling asked a question designed to serve as the foundation for the Government's case-in-chief. Had Diggs's answered "yes" to the second question, the Government would have had a clear statement establishing Diggs's guilt for the charged offense. Officer Spurling's choice of questions accomplished the unspoken goal of the traffic stop and subsequent questioning. Not only did Officer Spurling locate a stolen firearm, he obtained an admission from Diggs that it was his gun.

While searching the vehicle, Officer Spurling commented, "I knew there was one in there. I'm glad you said something." (ECF No. 18) This statement was made before Diggs was given a *Miranda* warning, but after he had told the officer about the gun. The statement's place in the sequence of events appears to confirm that Officer Spurling's question to a seated Diggs, "is it yours?" was less concerned with officer safety and more concerned with eliciting an incriminating statement. (*Id.*) It appeared to

verbalize Officer Spurling's unspoken agenda: he suspected there was a gun in the car, but wanted Diggs confess that the gun was his. (*Id.*)

Officer Spurling's actions favor a finding of deliberateness. Although Diggs's encounter with law enforcement was not the archetypical, prolonged two-step interrogation found in the case law, the *Williams* factors, taken together, support a finding that Officer Spurling's two-step interrogation was deliberate.

The Government's counter argument highlights the brevity of the of Officer Spurling's questioning and the informal nature of the encounter. (ECF No. 21) Context and timing are only two factors this court may consider in its deliberateness analysis. *See Williams*, 435 F.3d at 1158. Although these two factors weigh against deliberateness, other objective evidence favors such a finding. The continuity of interrogator, the overlapping content of the interviews, as well as Officer Spurling's conduct all favor deliberateness. On balance, the evidence favoring deliberateness outweighs the evidence disfavoring it.

        b.    *Effectiveness of the Midstream Miranda Warnings*

"When an interrogator has deliberately employed the two-step strategy, *Seibert* requires the court then to evaluate the effectiveness of the midstream *Miranda* warning to determine whether the post-warning statement is admissible." *See id.* at 1160. "The court must determine, based on objective evidence, whether the midstream warning adequately and effectively apprised the suspect that he had a genuine choice whether to follow up on his earlier admission." *Id.* (internal quotations omitted). "In its analysis, the court should look both to the objective circumstances the plurality [in *Seibert*] cited as bearing on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their objective and to the curative measures characterized by Justice Kennedy as designed to ensure that

a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning." *Id.* (internal quotations omitted).

"Thus, the court must address (1) the completeness and detail of the pre-warning interrogation, (2) the overlapping content of the two rounds of interrogation, (3) the timing and circumstances of both interrogations, (4) the continuity of police personnel, (5) the extent to which the interrogator's questions treated the second round of interrogation as continuous with the first and (6) whether any curative measures were taken." *Id.*

Since *Williams*, the Ninth Circuit has emphasized the important of curative measures. "'[T]he district court must suppress post-warning statements unless the interrogators take curative measures to apprise the defendant of his rights.'" *United States v. Reyes-Bosque*, 596 F.3d 1017, 1031 (9th Cir. 2010)(quoting *United States v. Narvaez-Gomez*, 489 F.3d 970 (9th Cir. 2007)).

Curative measures could include "a substantial break in time and circumstances between the pre-warning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *Seibert*, 542 U.S. at 622 (Kennedy, J concurring). "Alternatively, the additional warning that explains the likely inadmissibility of the pre-warning custodial statement may be sufficient." *Id.*

Officer Spurling's midstream *Miranda* warning was ineffective. The officer took no curative measures to appraise Diggs of his rights. Mere minutes passed between Diggs's pre-warning statement and the *Miranda* warning. (ECF No. 18) Rather than give the impression of two distinct interviews, the lack of a break and identical surroundings, would lead a reasonable person to believe that he was being subjected to one, continuous interrogation. *See id.* Officer Spurling also did not explain to Diggs that his pre-warning statements were potentially inadmissible. *Id.* The lack of curative measures renders Diggs's post-warning statements inadmissible.

ACCORDINGLY, and for good cause shown,

IT IS HEREBY RECOMMENDED that Diggs's motion to suppress (ECF No. 17) be GRANTED.

IT IS FURTHER RECOMMENDED that all statements made after Diggs was seated on the curb should be SUPPRESSED.

IT IS SO RECOMMENDED.

DATED this 14th day of November, 2016.

_____
CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE